[Civ. No. 42245. First Dist., Div. One. Oct. 24, 1979.]

CITY OF LAFAYETTE, Plaintiff and Appellant, v.
AMERICAN TELEVISION AND COMMUNICATION CORPO-
RATION, Defendant and Respondent.

TOWN OF MORAGA, Plaintiff and Appellant, v.
AMERICAN TELEVISION AND COMMUNICATION CORPO-
RATION, Defendant and Respondent.

COUNSEL

Charles J. Williams for Plaintiffs and Appellants.

Gray, Cary, Ames & Frye, Rudi M. Brewster, Richard A. Paul and John M. Phelps for Defendant and Respondent.

OPINION

MARTIN, J.*—By complaints separately filed but subsequently consolidated for trial, appellants City of Lafayette and Town of Moraga sought injunctive and declaratory relief against respondent American Television and Communication Corporation, a community antenna television (CATV) company, to enforce appellants' asserted rights to regulate the rates charged by respondent for CATV service within appellants' municipal limits. The trial court denied the relief appellants requested. We reverse with directions.

As we view it the appeal presents a single narrow question of law: Did the trial court correctly construe a contract between respondent's predecessor in interest (Cable-Vision) and Contra Costa County? We conclude that it did not.

In 1966, before either Lafayette or Moraga was incorporated, Cable-Vision applied to the county for a license to provide CATV service within certain unincorporated areas of the county, including areas subsequently incorporated as Moraga and as part of Lafayette. The county granted the license for a 20-year term upon the authority of Government Code section 53066[1] and of the county's own preexisting CATV

---

*Assigned by the Chairperson of the Judicial Council.

[1]In 1966, Government Code section 53066 provided: "Any city or county or city and county in the State of California may, pursuant to such provisions as may be prescribed by its governing body, authorize by franchise or license the construction of a commu-

ordinance (then designated and herein referred to as Ordinance No. 1980[2]), and Cable-Vision accepted the license. The license expressly incorporated "all terms and conditions of Ordinance 1980."

In 1968 respondent acquired Cable-Vision, accepted an assignment of the license, and assumed all of Cable-Vision's obligations thereunder.

Parts of the unincorporated area to which the license extended were incorporated into the new municipalities of Lafayette (in 1968) and Moraga (in 1974). Each municipality undertook, promptly upon incorporation, to adopt Ordinance No. 1980 as its own. Thereafter the two municipalities appear to have followed widely divergent courses with respect to CATV services within their municipal limits: Lafayette apparently elected to permit the county to continue to supervise the license for the time being, while Moraga apparently elected to assert its own control over CATV. In 1974 respondent proposed to raise its rates, submitting formal requests for approval first to the county and subsequently to each of appellants. The county approved a rate increase for unincorporated parts of the service area; Lafayette first indicated that it would approve but then withdrew its approval; Moraga did not take action. When, in 1976, respondent nevertheless announced its intention to impose the new county-approved rates in Lafayette and in Moraga, and to cut off service for nonpayment, appellants brought the underlying lawsuits.

---

nity antenna television system. In connection therewith, the governing body may prescribe such rules and regulations as it deems advisable to protect the individual subscribers to the services of such community antenna television system. The award of the franchise or license may be made on the basis of quality of service, rates to the subscriber, income to the city, county or city and county, experience and financial responsibility of the applicant plus any other consideration that will safeguard the local public interest, rather than a cash auction bid. Any cable television franchise or license awarded by a city or county or city and county pursuant to this section may authorize the grantee thereof to place wires, conduits and appurtenances for the community antenna television system along or across such public streets, highways, alleys, public properties, or public easements of said city or county or city and county. Public easements, as used in this section, shall include but shall not be limited to any easement created by dedication to the city or county or city and county for public utility purposes or any other purpose whatsoever." The section has subsequently been amended to add a provision not relevant to this appeal.

[2]Ordinance No. 1980 was recodified in 1973 without substantive change; former sections 6400-6503 now appear as sections 58-2.002—58-12.004 of the Contra Costa County Ordinance Code.

The parties and the trial court correctly agreed that the license, as granted by the county and accepted by Cable-Vision, was a contract (cf. *Orange County Cable Communications Co. v. San Clemente* (1976) 59 Cal.App.3d 165, 170-171 [130 Cal.Rptr. 429]), and not subject to any regulatory authority by the Public Utilities Commission as the system is not considered a public utility. Respondent properly further concedes that each municipality "may regulate it in all legitimate respects not inconsistent with its license agreement" and not in derogation of its vested rights thereunder. The threshold issue was whether appellants' attempts to regulate respondent's rates were consistent with the license.

The trial court never passed the threshold. Holding that neither appellant could regulate respondent's rates and that each must abide by rate decisions arrived at between respondent and the county, it concluded that municipal regulation of respondent's rates (1) would constitute an unconstitutional impairment of the obligation of the contract represented by the license (cf. U.S. Const., art. I, § 10; Cal. Const., art. I, § 9, formerly § 16), and (2) would conflict with a perceived public interest in unified regulation for the single integrated CATV system operated by respondent in Contra Costa County.

In our view the trial court's conclusions are founded on a fundamental misreading of the contract. The key to our analysis is section 6503 of Ordinance No. 1980, the terms of which are incorporated into the license. Section 6503 reads as follows: "Whenever any portion of the territory covered by this license shall be annexed to, or otherwise become a part of any municipal corporation or of any other County, or any other agency or political subdivision of the State of California, the County's rights hereunder shall inure to the benefit of such other public body and its appropriate officers."

We focus on the phrase "the County's rights hereunder." The phrase has been in the ordinance, and thus (by incorporation) in the license, from the outset. If "the County's rights hereunder" included the function of regulating rates, then clearly that function inured to the benefit of appellants; in such circumstances the passage of control over rates, being *contemplated* by the contract, could not be said to *impair* the contract (cf. *Southern Pacific Co. v. Portland* (1913) 227 U.S. 559,

572 [57 L.Ed. 642, 651, 33 S.Ct. 308]; 5 McQuillin, Municipal Corporations (3d ed. 1969) Constitutionality of Ordinances, § 19.51, pp. 517-521), and the contract itself would evidence acquiescence by the contracting parties themselves in a determination that unified regulation of rates was *not* necessary.

We conclude that "the County's rights hereunder" included the "right" to regulate rates. Section 6403 of Ordinance No. 1980 provides that "No increase in the rates and charges to subscribers, as set forth in the schedule filed and approved with licensee's application, may be made without the prior approval of the Board expressed by resolution." This provision represents but one of several aspects of control of CATV entrusted to cities and counties of this state by the Legislature in Government Code section 53066. Absent such a provision, regulatory control of CATV would, under general principles, have remained in the state (cf. 45 Cal.Jur.3d, Municipalities, § 85, pp. 151-152). Hence as between the state and its counties and cities, the counties and cities have, by statutory delegation, acquired the *right* to regulate CATV within their respective geographic confines (cf. also *Orange County Cable Communications Co.* v. *San Clemente, supra,* 59 Cal.App.3d 165, 171-174). We cannot in this respect distinguish the function of regulating CATV rates from the function (which respondent concedes to be a "right") of receiving a license fee calculated as a percentage of the same rates: Each function is statutorily vested in the county or in the city; the active-passive distinction between regulating rates and receiving fees appears to us to be immaterial to the semantic classification at issue. In our view each function represents in the relevant sense a "right" of Contra Costa County which the county, by virtue of section 6503 and with the acquiescence of Cable-Vision, anticipated would pass to any municipality which might thereafter be incorporated within the relevant geographic area of the county.

Our conclusion is arrived at independent of, but is strongly supported by, the conduct of the parties before this controversy arose (cf. 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 527, pp. 449-450): Respondent, having obtained approval of a rate increase from the county limited to the unincorporated areas thereof, then individually and formally applied to each of appellants for a similar rate increase "in

order to establish uniform rates throughout its franchise area." On appeal respondent contends that these applications to appellants were gratuitous gestures of good will, but nothing in the record supports respondent's contention, and our examination of the evidence persuades us that respondent, through most of 1975, believed that the county approval extended only to unincorporated areas and that respondent could not raise rates within Lafayette or Moraga without the approval of the municipality.

We have considered each of respondent's arguments in support of a narrower construction of "the County's rights hereunder"; we find none of them to be persuasive.

First, respondent contends that section 6503's reference to "rights" refers, in the context of Ordinance No. 1980 as a whole, only to the right to receive license fees. Respondent directs our attention specifically to section 6411 and to section 6432, subdivision (b), of the ordinance. Section 6411 reads as follows: "A licensee shall not sell, transfer, lease, dispose of, or assign this license or any rights thereunder, including any beneficial interest or right to operate thereunder, by voluntary sale, merger, consolidation, or otherwise, or by operation of law, without the prior written consent of the Board and under such conditions as may therein be prescribed, and then only by a duly executed instrument in writing, filed with the Board; provided, however, that the foregoing provisions of this Section shall not apply to a transfer or assignment of this license, or of any right or privilege thereby granted, contained in or made by a deed of trust, mortgage or other instrument, given merely to secure the payment of any indebtedness of a licensee. The said consent of the Board may not be arbitrarily refused for such assignments and transfers. The provisions of this Division and all rights, obligations and duties hereunder shall inure to and be binding upon any assignee who must agree in a duly executed written instrument filed with the Board to comply with all the said provisions before any such transfer will be effective." Subdivision (b) of section 6432 reads as follows: "The licensee shall prepare and furnish to the Director of Public Works and the County Administrator at the times and in the form prescribed by either of said officers, such reports with respect to its operations, affairs, transactions or property, as may be reasonabl[y] necessary or appropri-

ate to the performance of any of the rights, functions or duties of the County or any of its officers in connection with the license."

Reasoning from the axioms that "a statute [should] be read as a whole, and its various parts harmonized so as to give effect to legislative intent" (cf. *Smith* v. *Regents of University of California* (1976) 58 Cal.App.3d 397, 403 [130 Cal.Rptr. 118]) and that "The fact that a provision of a statute on a given subject is omitted from other statutes relating to a similar subject is indicative of a different legislative intent for each of the statutes" (cf. *Hennigan* v. *United Pacific Ins. Co.* (1975) 53 Cal.App.3d 1, 8 [125 Cal.Rptr. 408]), respondent contends that inclusion of the words "privilege" and "obligations and duties" in subdivision (b) of section 6432 lends dispositive significance to the omission of similar terms from section 6503, which refers only to "the County's rights hereunder."

We disagree. To us it is clear that section 6411 relates solely to the *licensee's* posture under the license and has no necessary relevance to the county's status. And we find nothing in section 6432's reference to "rights, functions or duties" to suggest that the county's regulatory control of CATV rates is not, in relevant respect, a "right" of the county. Clearly rate regulation is a *function,* but neither the omission of that term from section 6503 nor ordinary semantics compels the conclusion that the function of regulating rates cannot simultaneously be a "right" within the meaning of section 6503. Nor can we accept respondent's implicit argument that CATV rate regulation should be regarded, as between the licensor county and the licensee, as a *duty* of the county. Certainly the county would have a duty to its *residents* to regulate any CATV licensee operating within its boundaries. But it is unrealistic to suggest that the county would owe a similar regulatory *duty* to the regulated licensee. Were we to pursue respondent's argument to its Hohfeldian extreme (cf. Hohfeld, *Some Fundamental Legal Conceptions as Applied to Judicial Reasoning* (1923) 23 Yale L.J. 16; 4 Pound, Jurisprudence (1959) 77-83), we could conclude that the county's rate-regulation function is in pure theory *neither* a right *nor* a duty but simply a *power* which the county, by delegation of the people through the Legislature (Gov. Code § 53066), is entitled to exercise. We take it, however, that the drafters of Ordinance No. 1980 saw no occasion for Hohfeldian nicety. We are satisfied that a reading of Ordinance No. 1980 as a whole permits the conclusion that "the County's

rights hereunder" in section 6503 include the "right" to regulate rates and are not limited to an entitlement to license fees.

Respondent further contends that it was the *intention of the parties* that "the County's rights hereunder" should be so limited. To support this contention respondent relies on the trial testimony of two of its witnesses: Allen, who had been employed by Cable-Vision in 1966 and who had prepared the license application, and Rifkin, who was the president of respondent when it took assignment of the license in 1968. The testimony falls far short of supporting respondent's contention either factually or legally. Contrary to the broad paraphrases in respondent's brief, Allen was in fact unable to say what even Cable-Vision's view of section 6503 had been, and he never attempted to assess the county's understanding. A fair summary of Allen's testimony is that he had not considered the point at all: "Q. [by counsel for respondent]. When you obtained the CATV franchise in 1966, what did you actually believe that you were obtaining on behalf of Cable-Vision? [Municipalities' objection on the ground of irrelevance overruled.] THE WITNESS [Allen]: We were getting an operating authority from the county for a period of 20 years, to operate an integrated system within a specifically defined bound[a]ry area. By MR. MALONEY [counsel for respondent]: Q. Did you ever believe that any newly incorporated area that might come along would be able to interfer[e] with your ability to serve the remaining parts of the franchise? A. Well under the concept of an integrated system, no. I definitely never had that enter my mind. That is, did you mean for example now the Town of Moraga which lies between Lafayette and Orinda would impose some kind of conditions that would enable me—that would require me to stop service to Orinda? No, that never entered my mind. . . . THE COURT: Now I think you probably did read [section 6503], what did you think that meant? THE WITNESS: I am not sure I specifically focused on it in a legal sense. I was an operating officer. . . . By Mr. Williams [counsel for appellants]: Q. Mr. Allen, is it likely, sir, that some other officer of Cable-Vision at the time of the acquisition would have inquired into and attempted to understand the meaning of section 6503 of Ordinance 1980? A. I don't know, the ownership was in Boston, Massachusetts. Q. You were not aware of any discussions within the corporation at the time of acquisition which had anything to do with what that section may have meant and the effect of annexation or incorporation of any area to the cities? A. At the time of acquisition of what? Q. Of the system, the franchise from the county

when you bought Cable-Vision. A. I don't have any specific knowledge."

Allen did not offer any other testimony relevant to the issue. Even were the circumstances before us such as to permit consideration of unexpressed intention (but cf. 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 522, pp. 445-446) on the basis of extrinsic evidence (but cf. Witkin, Cal. Evidence (2d ed. 1966) Documentary Evidence, § 725, p. 670 et seq.), Allen's testimony simply affords no such evidence.

Nor did Rifkin's testimony lend factual support to respondent's contention: He had not obtained a legal opinion as to the potential effect of a subsequent incorporation of a part of the licensed area, and his conclusion at the time respondent received the assignment was that in such an event the new municipality "would be content to essentially exercise their police power, to the extent if there were any, to collect the fees as they might have been apportioned and otherwise to abide by the terms." More to the point, Rifkin's opinion, arrived at two years after the contract was formed, was legally irrelevant: As an assignee respondent simply assumed, but was powerless to alter without the county's acquiescence, the position Cable-Vision had held under the contract (cf. 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 751, p. 628).

Next respondent contends that a strong public interest in unitary control of an integrated CATV service area supports the construction for which it argues. "The general public interest is maintained and enhanced when an integrated CATV system, such as Cable-Vision's, is subject to the jurisdiction of only one regulatory body." But respondent's quotations, extracted from a foundation study and from a law review article, and citations to other legal commentary, fall short of constituting a persuasive showing of the public interest it asserts, and in any event cannot operate to alter what we find to be the plain meaning of "the County's rights hereunder" in section 6503. It is wholly appropriate for the county, under the delegation represented by Government Code section 53066, to make its own legislative determination of what the public interest is and requires; a court's view of the public interest cannot in any event supplant that of the appropriate legislative body (cf. 13 Cal.Jur.3d, Constitutional Law, § 103, pp. 194-197; 45 *id.,* Municipalities, §§ 189, 215, pp. 303-305, 335-336).

Finally, respondent contends that general principles of law compel the conclusion that the county maintained rate-regulating control over the license, in that "California courts have repeatedly held that when a portion of an area served by an integrated public service system is incorporated within a city, the original regulatory body retains jurisdiction over the entire public service area." But respondent's generalization, and the cases with which respondent supports it, do not apply to a situation in which, as here, the proprietors of the public service system have expressly agreed that regulatory control within any subsequently incorporated area will pass to the incorporating municipality. Neither reason nor any precedent of which we have been made aware compels a conclusion that respondent's generalization should prevail over a specific contractual term.

We conclude as a matter of law that Cable-Vision and the county expressly agreed, in relevant part, that any municipality subsequently incorporated within the service area would be empowered to regulate Cable-Vision's rates within that municipality, that the agreement was valid and is binding upon respondent, and that for that reason appellants' attempts to regulate respondent's rates neither impaired respondent's contract in a constitutionally cognizable sense nor offended public policy.

Because the trial court decided the action on the ground that the license did not permit the subsequently incorporated municipalities to regulate respondent's rates, the court did not reach the question whether appellants had in fact assumed, retained, and effectively exercised the right to regulate rates. This question presents complex issues of fact and of law, many of which are alluded to in the record but none of which is before us for decision. We do not express any opinion as to such issues, which should in the first instance be presented to and determined by the trial court.

The judgment is reversed and the action is remanded to the trial court for further proceedings consistent herewith. Upon issuance of the remittitur herein the amounts heretofore collected and deposited or escrowed by respondent under the terms of this court's orders dated October 12, 1977, and December 6, 1977, and of the trial court's order

dated October 28, 1977, shall become subject to disposition upon order of the trial court.

Elkington, Acting P. J., and Newsom, J., concurred.